IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PATRICIA LOWE,                        )
                                      )      CIVIL ACTION
            Plaintiff,                )
                                      )      NO:1:04-CV-2423-ECS
v.                                    )
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

**O R D E R**

**I.**
**Introduction**

Patricia Lowe, the plaintiff-appellant ("Appellant"), brings
this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain
judicial review of a final decision of the Commissioner of Social
Security ("Commissioner") denying her claim for Supplemental
Security Income ("SSI"). This case is presently before the Court
upon the administrative record and the parties' pleadings and
briefs. The parties have consented to the jurisdiction of the
undersigned for final determination of this case. [Doc. 15]. For
the reasons expressed herein, the Commissioner's decision is
**REMANDED** for further proceedings consistent with this order.

**II.**
**Procedural History**

Appellant filed an application for SSI benefits on July 17,
2001. (Transcript of Administrative Record ("T.") at 37-49).[1]

---

[1] Appellant first filed an application for supplemental
security income on July 10, 2000, which was denied. (T. at 33).
Instead of appealing the denial, Appellant filed a second
application for disability benefits on July 17, 2001, and it is this

Appellant's application alleges disability commencing on July 2, 1997.  (T. at 38).  The application was denied initially and upon reconsideration.  (T. at 14-16).  Upon Appellant's request, a hearing was held before Administrative Law Judge Robert C. Allen ("ALJ") on May 8, 2002. (T. at 373).  The ALJ issued a decision denying Appellant's claims on March 11, 2003. (T. at 21A).  The Appeals Council denied Appellant's request for review of the ALJ's decision on June 8, 2004, thereby adopting it as the final decision of the Commissioner and making it subject to judicial review.  (T. at 8A).

### III.
### Factual Background

Appellant was forty-nine years old at the time of the May 8, 2002, hearing.  (T. at 45).  She has a ninth-grade education and her past relevant work consists of employment as a cleaner and housekeeper.  (T. at 53).

**A.   Medical History: Appellant's Physical Impairments**

Appellant alleges that her disability began on July 2, 1997.[2]  (T. at 17A, 38, 382). In January 1998, Appellant tested positive for the human immunodeficiency virus ("HIV").[3]  (T. at

_____

application that is the subject of this appeal.  (T. at 37-49).

[2] In her initial application for supplemental security income, Appellant stated that her disability began on February 2, 1998.  (T. at 34).  In her second application, Appellant stated an onset date of July 2, 1997.  (T. at 38).

[3] "HIV" is a virus that is the cause of the acquired immune deficiency syndrome ("AIDS").  HIV suppresses the immune system and leaves the individual vulnerable to opportunistic infections and

AO 72A
(Rev.8/82)

313).  Appellant believes she acquired the virus during a blood transfusion she had on July 2, 1997.  (T. at 270).  On February 19, 1998, Appellant presented to Grady Hospital's walk-in clinic complaining of "progressive right upper extremity weakness and clumsiness."  (T. at 313).  Appellant was admitted to the hospital at this time to have an "MRI of the brain with gadolinium and lumbar puncture to clarify the above condition".  Id.  While the MRI ruled out enhanced lesions on her brain as the cause of her right extremity problems, it was still determined that Appellant suffered from "right upper extremity weakness with upper motor neuron pattern."  Id.

On September 23, 1998, Appellant had an abscess removed from her left breast.  (T. at 311).  Six months later, on or about March 29, 1999, Appellant began HIV treatment through the Fulton County Health Department's Ryan White Program.  (T. at 244-255).  Lab tests performed from May 1999 through February 2000 show that Appellant had a lower than average red blood cell count,

---

cancers. HIV is often asymptomatic for years, but eventually progresses to AIDS in most instances. AIDS is characterized by a CD4 cell (a type of immune cell) count below 200. J.E. Schmidt, Attorneys' Dictionary of Medicine, Part 1, Letters A-CG (LexisNexis ed. 2004).

AO 72A
(Rev.8/82)

indicating that she was anemic.[4]  (T. at 228, 219, 214, 212, 209, 206, 203, 200).

Records from the Ryan White Program note that Appellant had an abscess on her left large toenail and a "calloused area on sole" (T. at 252), but it is not clear when this observation was made.  On May 26, 1999, a plantar's wart was listed among Appellant's medical problems by someone at the Ryan White Program.[5]  (T. at 230).

One year later, on May 18, 2000, Appellant presented to the Grady Emergency Room with right wrist and right arm pain.  (T. at 134).  Appellant reported difficulty squeezing a mop.  Id. Appellant was discharged with non-steroidal, anti-inflammatory drugs.  Id.; (App. Br. at 5)[Doc. 9]. On June 28, 2000, Appellant returned to the Grady Emergency Room because her right wrist pain was "unrelenting." (T. at 132).  The doctor placed Appellant in a splint, counseled her to avoid lifting, and referred her to the Orthopedic Clinic.  Id.  On July 10, 2000, Appellant presented to the Orthopedic Clinic, where she tested positive for

---

[4] "Anemia" is a condition of the blood in which the number of red cells is below normal, or the amount of hemoglobin--the oxygen-carrying red pigment--in the red cells is below normal, or both the number of cells and the amount of hemoglobin are below normal.  J.E. Schmidt, Attorneys' Dictionary of Medicine, Part 1, Letters A-CG (LexisNexis ed. 2004).

[5] A plantar's wart occurs when the common wart (verruca vulgaris or simplex) grows on the sole of the foot.  J.E. Schmidt, Attorneys' Dictionary of Medicine, Part 6, Letters TH-Z (LexisNexis ed. 2004).

4

tenosynovitis through a Finklestein's test.[6]   (T. at 130).
Appellant was injected with a steroid, placed in a cast, and
advised to follow up in four weeks for x-rays.   Id.

Sometime at the end of 2000, Dr. Nancy Koughan became
Appellant's treating physician at the Ryan White Program.  (T. at
184, 178).  On August 10, 2000, Dr. Koughan noted that Appellant
was still in a wrist brace and that her HIV was asymptomatic.
(T. at 184).  Lab reports from August 2000 and October 2000 show
that Appellant remained anemic.  (T. at 182, 185).

On November 19, 2000, a non-examining state agency physician
performed a residual functional capacity ("RFC") assessment of
Appellant.  (T. at 141-149).  The physician found that Appellant
could occasionally lift twenty pounds; frequently lift ten
pounds; and stand or walk for about six hours in an eight-hour
workday.  (T. at 142).

On December 14, 2000, Appellant complained to Dr. Koughan of
sleep disturbance and cramping at the "surgery sight" that was
keeping her awake at night.  (T. at 178).  Two months later, on
February 14, 2001, Dr. Koughan noted that Appellant's HIV was
still asymptomatic and that Appellant had diarrhea controlled by
Immodium.  (T. at 177).

---

[6] "Finkelstein's Test" is a test for de Quervain's disease. De
Quervain's disease refers to the inflammation of the tendons, or
tenosynovitis. J.E. Schmidt, Attorneys' Dictionary of Medicine, Part
5, Letters PR-TG (LexisNexis ed. 2004).

On June 4, 2001, Appellant had another abscess drained from her left breast.  (T. at 297-299; 156-158).  Shortly thereafter, on June 13, 2001, Appellant saw Dr. Koughan.  (T. at 168).  During this visit, Appellant denied any HIV-induced fatigue and Dr. Koughan observed that Appellant's HIV remained asymptomatic.  Id. One month later, on August 12, 2001, Appellant reported to Dr. Koughan that she suffered from intermittent night sweats five times per week and still had diarrhea controlled by Immodium. (T. at 163).  Appellant's HIV remained asymptomatic and Dr. Koughan encouraged Appellant to stop using tobacco.  Id.

On October 9, 2001, Dr. Jean Joseph Philippe performed a consultative physical examination of Appellant.  (T. at 256-259). During this examination, Appellant complained of "constant fatigue and weakness since 1997 with dizziness and headache off and on."  (T. at 256).  Appellant told Dr. Philippe about her history of anemia, that she has tendinitis with weakness in both upper extremities, that her right hand and fingers were always numb and stiff, and that her right hand and fingers lost strength at times. Id.  Appellant also told Dr. Philippe that she smoked, had been unemployed since 1997, and was depressed over her HIV status.  (T. at 257).  Dr. Phillipe observed that Appellant's left breast was "[e]nlarged with multiple ceptic mass; evidence of healing incision over left areola still draining sero-purulent malenal", but that her right breast was normal.  Id.  He found that Appellant had "decreased dexterity" in her right hand and

AO 72A
(Rev.8/82)

fingers.   Id.   The lab report showed that her red blood cell count and hemoglobin were "low."   Id.

Dr. Philippe found that Appellant suffered from (1) HIV; (2) HIV polyneuropathy;[7] (3) Diarrhea, secondary to her HIV medication; (4) Tendinitis on right hand, wrist status post right hand surgery; (5) Multiple left breast abscesses with acute mastitis;[8] and (6) Amenia, secondary to HIV status.   Id.   Dr. Philippe concluded that all of these conditions were "directly connected or related" to her HIV status, adding "[s]he is doing fairly well, HIV-wise, and has been adherent to her medications. Her physical abilities and capacities are improving as her HIV status is improving.   The chronic condition will require serious and continuous medical care and her to take her medications regularly if she wants to be functional work-wise." (T. at 259).

Appellant's October 11, 2001, lab report shows that her red blood cell count and hemoglobin were still low.   (T. at 335). Dr. Koughan noted on that date that Appellant remained asymptomatic of HIV, but had a dry cough.   (T. at 334). Shortly

---

[7] "Polyneuropathy" refers to any nerve disease which affects several nerves at the same time. J.E. Schmidt, Attorneys' Dictionary of Medicine, Part 4, Letters M-PQ (LexisNexis ed. 2004).

[8] Acute mastitis and breast abscess: An acute inflammation of a breast caused by staphylococci or streptococci that enter the breast through cracks and fissures in the nipples, usually during the early weeks of nursing (but it may occur at other times). The infection may progress to the formation of a single abscess or of multiple abscesses.   J.E. Schmidt, Attorneys' Dictionary of Medicine, Part 1, Letters A-CG (LexisNexis ed. 2004).

AO 72A
(Rev.8/82)

thereafter, on November 1, 2001, a second non-examining state agency physician performed a consultative RFC examination of Appellant. (T. at 261-268). Like the first physician, this physician found that Appellant could occasionally lift twenty pounds; frequently lift ten pounds; and stand or walk for about six hours in an eight-hour workday. (T. at 142).

On November 11, 2001, Appellant underwent a psychological examination by Dr. Joan H. Kent, Ph.D. (T. at 270-273). Dr. Kent found that Appellant could read at a fourth grade level and perform math at a third grade level. (T. at 272). Appellant's performance IQ was 68; verbal IQ was 71; and full-scale IQ was 67. Id. Appellant told Dr. Kent that her tendinitis, foot problems, HIV-related symptoms of night sweats, insomnia, diarrhea, nausea, and skin rash, as well as breast abscesses, lower back and wrist pain, together with her HIV diagnosis, were the reasons she could not work. (T. at 270). Appellant's long-term, live-in boyfriend, Eddie, also met with Dr. Kent and reported that Appellant "gets quiet and won't walk. She doesn't like to go out and mostly stays at home in the last 10 years." (T. at 271). Eddie also confirmed that Appellant had to scrape off the dry skin on the soles of her feet with a knife, and afterward, she cannot walk. Id. Eddie reported that "he is disabled and needs her [Appellant] to look after him. [Appellant] does the house chores and is responsible in the kitchen." Id. Dr. Kent concluded that Appellant was "[l]imited by wrist pain

and feet.  Says she might have had a 'light stroke' or arthritis or tendinitis in the wrist.  However, she reports no decline in mental functioning."  (T. at 273).

A December 6, 2001, lab test showed that Appellant was still anemic and Appellant reported to Dr. Koughan that she was still having night sweats. (T. at 325).  Appellant's HIV remained asymptomatic.  Id.  Also, on this date, Dr. Koughan wrote a letter to the Atlanta Housing Authority, stating that Appellant "suffers from a chronic, debilitating disease that leaves her fatigued and unable to work full-time.  She is considered disabled from a medical standpoint. Please assist her in any way possible."  (T. at 333).

Later that month, on December 26, 2001, in a Reconsideration Disability Report to the SSA, Appellant stated that she was still having night sweats, had a "knot under [left] foot", stomach pain, excessive bleeding in vaginal area, "a lot of coughing", and tired easily.  (T. at 100).  Appellant also reported that she could take care of her personal needs, but needed "some assistance with strenuous tasks."  (T. at 102).

Three days later, on December 29, 2001, Appellant was admitted to Grady and was not discharged until January 5, 2002. (T. at 293).  Appellant was to have surgery on her left breast, but due to her skin's condition, the doctors decided not to perform the surgery. (T. at 294-295).

9

The next month, on January 22, 2002, Appellant filled out a Daily Functioning Questionnaire, presumably for the SSA, and listed her household duties as mopping, cooking and washing dishes. (T. at 116). Appellant noted, however, that she had problems holding onto the mop and washing dishes. Id. Appellant explained that she stopped working because she "had pain and sometime diarrhea and had problem breathing [sic]." (T. at 117). She also "had problem hold things and I had problem walk I have pain under my left foot [sic]." (T. at 118).

On February 4, 2002, Dr. Koughan noted that Appellant remained asymptomatic of HIV and that she was still in a splint, "[secondary] to thumb paresthesias, off work, [and] unable to fully use dominant hand." (T. at 325).

On February 19, 2002, Appellant has another RFC assessment by a non-examining state physician, who concluded that Appellant could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand or walk for six out of eight hours per day. (T. at 344-350).

**B. Hearing Testimony**

**1. Testimony of Appellant**

At the May 8, 2002, hearing, Appellant testified that she weighed 169 pounds and was five feet seven inches tall. (T. at 380). She has no education or training beyond the ninth grade. Id. She has never had a drivers' license and does not know how to drive. (T. at 380-381). The ALJ stated that the alleged

onset date of disability was July 2, 1997, and Appellant agreed, stating that this was the date on which she was "diagnosed" as HIV-positive.[9] (T. at 382). Appellant further testified that she had not worked since 1997 because on July 4, 1997, she "fell out a car and my leg -- I messed up both of my leg so I couldn't work. [] I burnt them on hot asphalt." Id. Appellant had a skin graft as a result of this accident. (T. at 384).

Appellant testified that she lives with a friend who supports her and that she receives food stamps. (T. at 385-386). Appellant stated that she spends a lot of time seeing doctors. (T. at 387). She stated that she has tendinitis and arthritis in her right hand. Id. Appellant also testified that she had problems with her foot, stating "I don't know what this thing up on the bottom of my foot, but it hurt me when I walk. It hurt worse when I walk a long time [sic]." Id. Questioned by the ALJ, Appellant stated that she has had this foot problem for five or six years. (T. at 388). Appellant stated that she was referred to a foot doctor, but when she tried to see the foot doctor, she was told that the doctor had left the hospital. Id. Therefore, she has never seen a foot doctor. Id.

Appellant further stated that Dr. Koughan was her doctor for her HIV infection and that she started seeing Dr. Koughan

---

[9] The medical records, however, indicate that Appellant was *diagnosed* sometime in January 1998 (T. at 313), but that she believes she *acquired* the virus on July 2, 1997, when she had a blood transfusion. (T. at 270).

AO 72A
(Rev.8/82)

sometime in 2001.  (T. at 390-391).  Appellant testified that Dr. Koughan has told her that her HIV infection is "getting a little better".  (T. at 392).  Appellant stated that she takes her medications every day. Id.  Questioned as to what impairments her HIV caused, Appellant stated that she believed it caused her breast infection and fatigue.  (T. at 393).

The ALJ interrupted Appellant as she was answering a question regarding the nature of her examinations by Dr. Koughan. (T. at 394).  She was not able to complete this answer.  See id. Regarding her daily routine, Appellant testified that she "read[s] a little bit and watch[es] a little T.V."  Id. Appellant stated that she and her live-in friend do household chores together and generally help each other.  Id.  Appellant elaborated that she cannot vacuum or cook on her own because "I can't hold pots in my right hand.  No heavy pots.  I can't push a little buggy down the street to no wash house [sic]."  (T. at 395).  Appellant explained that her friend does not enjoy cooking; he cooks because Appellant cannot perform this task. Id.  Appellant stated, however, that she can cook "simple stuff". Id.  She does not go out for entertainment or attend church, and, while she has family, "I don't go outside the home . . . I don't associate with too many people.  I like to stay by myself." (T. at 396).  Appellant is on medication for depression and on several medications to treat her HIV.  (T. at 397).  She also takes sleeping pills and anti-diarrhea medicine. (T. at 397-398).

AO 72A
(Rev.8/82)

Appellant testified that she has trouble concentrating.  (T. at 399).

### 2.   Testimony of William Porter, Vocational Expert

At the May 8, 2002, hearing, Dr. Phillip W. Weirson testified as a vocational expert ("VE").  (T. at 399-405). Stating that the record was unclear, the VE was permitted to ask the claimant questions directly. (T. at 399). In particular, the VE asked Appellant to elaborate on her past work.  (T. at 400). Questioned about her past work in the "airline industry," Appellant explained that she washed "headsets for the airplane and what you do we'd wash them and shake them off and hang them up on the racks and let them dry then I push them out to the people to pack them and put them in [sic]". Id. Next, Appellant explained that her past work as a hotel maid consisted of cleaning hotel rooms. Id.  Appellant also cleaned cars at an automatic car wash facility.  Id.  She also stated that she had also done some dish washing work.  Id.

The VE then concluded that Appellant's past relevant work consisted of light/unskilled work and medium/unskilled work. (T. at 401-402).  The ALJ asked the VE what type of work a hypothetical person who had a "medium exertional limitation, manipulative limitations to include occasional reaching, handling and feeling with the right hand, a limitation of simple instructions, simple tasks and slight to moderate pain [limitation]" could perform. (T. at 402). The VE answered that

AO 72A
(Rev.8/82)

such a person would be able to do all the past relevant work in Appellant's job history and that none of her past jobs would be eliminated as a result of these restrictions.  Id.  The ALJ posed a second hypothetical where the exertional level was light, but all other limitations remained the same as those set forth in the first hypothetical.  (T. at 402-403).  Based on this hypothetical, the VE again opined that such a person would be able to do all the past relevant work in Appellant's job history. (T. at 403).  The third hypothetical that the ALJ posed consisted of a sedentary exertional level, but with all of the other restrictions remaining.  Id.  The VE opined that such a person would be precluded from Appellant's past relevant work.  Id. Specifically, the VE opined that Appellant's right hand limitations would preclude work at the sedentary level.[10]  Id.

## IV.
## Standard for Determining Disability

An individual is considered to be disabled for the purposes of disability payments if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.  §§ 423(d)(1)(A) and 1382c(a)(3)(A).  The impairment or

---

[10] 20 C.F.R. § 404.1567(a) defines "sedentary work" as that "involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."

impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. Moreover, the impairment must be of such severity that it precludes the claimant from performing his previous work and, considering his age, education, and work experience, any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3) and 1382c(a)(3)(B)-©).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that he is unable to perform his former type of work. Freeman v. Schweiker, 681 F.2d 727, 729 (11th Cir. 1982). If the claimant satisfies his burden of proving disability with respect to his former type of work, the burden shifts to the Commissioner to demonstrate that the claimant, given his age, education, work experience, and impairment, has the capacity to perform other types of jobs which exist in the national economy. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).

Under the regulations as promulgated by the Commissioner, a five step sequential process must be followed when evaluating a disability claim. 20 CFR §§ 404.1520(a) and 416.920(a). In the sequential evaluation, the Commissioner must consider in order: (1) whether a claimant is gainfully employed, 20 CFR §§ 404.152(b) and 416.920(b); (2) whether the claimant has a severe impairment which significantly limits his ability to perform

15

basic work-related functions, 20 CFR §§ 404.1520(c) and 416.920(c); (3) whether the claimant's impairment meets the listing of impairments found in: 20 CFR §§ 404.1520(d) and 416.920(d); (4) whether the claimant can perform his past relevant work, 20 CFR §§ 404.1520(e) and 416.920(e); and (5) whether the claimant is disabled in light of his age, education, and residual functional capacity, 20 CFR §§ 404.1520(f) and 416.920(f). If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 CFR §§ 404.1520(a) and 416.920(a).

## V.
## The ALJ's Decision

In his March 11, 2003, decision, the ALJ decided that Appellant was not disabled and denied her benefits. (T. at 15A). The ALJ found that "the claimant is HIV positive with tendinitis in her right hand, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one the [listed] impairments". (T. at 18A). The ALJ proceeded to determine Appellant's residual functional capacity to perform her past relevant work. (T. at 18A-19A). First, the ALJ articulated his conclusion that Appellant's HIV status was "essentially stable", noting her high CD-4 counts. (T. at 18A). The ALJ cited Dr. Philippe's finding that all of Appellant's conditions were directly connected or related to her HIV status. (T. at 18A-19A). Also, the ALJ observed that Dr. Phillip "indicated that her physical abilities and capacities were

16

improving as well as her HIV status." (T. at 19A). The ALJ next assessed Dr. Koughan's reports, finding that "the undersigned is impressed that Dr. Koughan does not support her findings of disability with medical test or documentation. Moreover, Dr. Koughan's opinion is contradictory to the weight of the evidence." Id. The ALJ supported this conclusion by referring to Dr. Kent's report that Appellant "cooks, washes dishes, mops, vacuums and dusts without assistance. She reads, does crossword puzzles, writes notes, watches television and listens to music. The claimant also reports that she shops and visits with her family." Id. Thus, the ALJ concluded that "the claimant's impairment of HIV+ with associated symptoms is maintained with prescribed medication and does not prevent all work activity." Id.

The ALJ found, however, that Appellant's "tendinitis imposes physical limitations of her residual functional capacity as noted herein." Id. On the other hand, the ALJ found that Appellant's "impairment of breast abscess would not preclude work at the residual functional capacity, cited herein." Id. Finally, the ALJ stated that he considered Appellant's allegations of pain, finding that the "evidence in this case does not establish the existence of an impairment that would cause pain and the undersigned does not totally discount the fact that the claimant may occasionally experience some degree of pain or discomfort." Id. However, "it is unreasonable to find that the

AO 72A
(Rev.8/82)

claimant's pain and discomfort are so intense and chronic that all work activity would be precluded." Id.

The ALJ discounted Appellant's testimony that she had trouble concentrating and had trouble with her memory because Dr. Kent found her recall and memory were intact, and because Dr. Kent noted no concentration problems. (T. at 20A). The ALJ addressed Appellant's foot problems, finding that "her daily activities discount her complaint of disabling foot pain." Id. The ALJ concluded that Appellant had an RFC for "light work activity with occasional reaching, handing and feeling with the right hand and limited right hand used; simple instructions, simple tasks and slight to moderate pain." Id. The ALJ decided that Appellant could return to her past relevant work as a maid and cleaner because these jobs are light and unskilled. Id.

In addition to the above, the ALJ also made the following specific findings:

1.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §416.920(b).

3.  The medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6.    The claimant has the residual functional capacity for light
      work activity, limited by occasional right hand overhead
      reaching, handling and feeling; simple instructions, simple
      tasks and slight to moderate pain.

7.    The claimant's past relevant work as maid and cleaner did
      not require the performance of work-related activities
      precluded by her residual functional capacity (20 CFR
      §416.965).

8.    The claimant's medically determinable HIV positive and
      tendinitis do not prevent the claimant from performing her
      past relevant work.

9.    The claimant was not under a "disability" as defined in the
      Social Security Act, at any time through the date of the
      decision (20 CFR § 416.920(e)).

**VI.**
**Standard of Review**

The scope of judicial review of the Commissioner's decision is limited.  The Court's function is (1) to determine whether the record, as a whole, contains substantial evidence to support the findings and decision of the Commissioner and (2) whether the Commissioner applied proper legal standards.  See Vaughn v. Heckler, 727 F.2d 1040, 1042 (11th Cir. 1984); see also Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).  While the Court defers to the Commissioner's factual findings, the Court performs a de novo review of the legal conclusions because "no presumption of validity attaches to the Secretary's determination of the proper legal standards to be applied in evaluating claims." Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993)(citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

**VII.**
**Discussion**

Appellant makes four arguments seeking to reverse the ALJ's decision to deny her benefits.  First, Appellant contends that the ALJ erred by failing to find that her anemia and foot problems were severe impairments.  Next, Appellant argues that the ALJ improperly evaluated her credibility.  Third, Appellant asserts that the ALJ erred in rejecting Dr. Koughan's opinion as the treating physician.  Appellant also contends that the ALJ erred in finding that her mental impairments did not meet the Listing 12.05C.  Finally, at the April 25, 2005, hearing before this Court, the parties raised the issue of whether the ALJ's decision meets the requirements regarding mental impairments set forth in the Eleventh Circuit decision in Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005).  The Court will address each of these arguments in turn.

**A.   Did the ALJ err by not finding that Appellant's anemia and foot problems were severe impairments?**

The regulations require that once it is found that a severe impairment exists, all medically determinable impairments, whether severe or not, must be thereafter considered in the remaining steps of the sequential analysis.  Specifically,

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of *all of your impairments* without regard to whether any such impairment, if considered separately, would be of sufficient severity. **If**

20

> **we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.** If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see §§ 416.920 and 416.924).

20 CFR 416.923 (emphasis added). "Hence, the plain language of the regulations makes it clear that the Secretary must consider the combined effect of a claimant's alleged impairments in sequential evaluation step two." Davis v. Shalala, 985 F.2d 528, 532 (11th Cir. 1993)(citing 20 C.F.R. § 416.920(c)). "In addition, if the Secretary finds a medically severe combination of impairments in step two, the regulations provide that the Secretary must consider the impact of the medically severe combination of impairments throughout the disability determination process." Id. (citing 20 C.F.R. § 416.923).

Furthermore, "an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled." Id. at 534 (citing Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987)). The Eleventh Circuit cited with approval the reasoning that a disability claimant should be evaluated *as a whole person*, and not evaluated as having isolated illnesses. Bowen v. Heckler, 748 F.2d 629, 635 (11th Cir.1984); see also Tingling v. Secretary of Health and Human Services, 575 F. Supp. 905, 909 (S.D.N.Y.1983)(ALJ must view claimant as a whole and not evaluate disability claimants as having several isolated symptoms); Karp

21

v. Schweiker, 539 F. Supp. 217, 220 (N.D.Cal.1982)(disability claimants are not to be evaluated as having several hypothetical and isolated illnesses); Landess v. Weinberger, 490 F.2d 1187, 1190 (8th Cir. 1974)(claimants are real people and entitled to have their disabilities measured in terms of their total physiological well-being).

In the instant case, at step two of the sequential evaluation process, the only severe impairments the ALJ acknowledged were Appellant's HIV infection and the tendinitis in her right hand.  (T. at 18A)("The medical evidence indicates that the claimant is HIV positive with tendinitis in her right hand, impairments that are severe within the meaning of the Regulations".).  Thereafter, during the remaining steps of the evaluation process, the ALJ considered Appellant's HIV status and "associated symptoms"; tendinitis, breast abscesses; "allegations of pain"; memory and concentration problems; and foot pain. (T. at 19A-20A).  There is no mention in the ALJ's opinion, at any step of the sequential evaluation process, of Appellant's anemia or her complaints of fatigue possibly related thereto.

Thus, the ALJ's opinion in the instant case reveals neither consideration of Appellant's anemic condition, nor her allegations of fatigue, in determining whether Appellant had a severe impairment during step two.  In addition, the ALJ failed to consider these conditions during the subsequent steps of the sequential evaluation process.  See generally (T. at 18A; 11A-

22

21A); 20 CFR 416.923.   Although the medical record and hearing testimony include frequent references to Appellant's low red blood cell count, indicative of anemia, as well as her complaints of fatigue, there is no discussion of these conditions.   <u>See, e.g.,</u> (T. at 228, 219, 214, 212, 209, 206, 203, 200 – lab reports showing anemia); (T. at 256 – report of "constant fatigue" to Dr. Phillipe). Thus, the Court concludes that the ALJ failed to meet his obligation to evaluate Appellant as a whole person; instead, he evaluated her as having isolated illnesses. <u>See Bowen v. Heckler</u>, 748 F.2d at 635.   This was error requiring remand.

Unlike anemia and fatigue, however, the ALJ's opinion does refer to Appellant's foot problems.   Specifically, in assessing her RFC, the ALJ noted that Appellant "testified that she has foot pain affecting her ability to walk; however, her daily activities discount her complaint of disabling foot pain."   (T. at 20A).   He erred, however, by not considering her foot problems during step two. <u>See</u> 20 C.F.R. § 416.923; <u>Davis</u>, 985 F.2d at 532 (ALJ "must consider the combined effect of a claimant's alleged impairments in sequential evaluation step two.").

Accordingly, this Court will remand this case for the ALJ to consider and address Appellant's anemia, fatigue, plantar's wart and associated foot problems at all applicable steps throughout the sequential evaluation process, particularly in steps two and five, in accordance with 20 C.F.R. § 416.923.

**B.   Did the ALJ improperly evaluate Appellant's credibility regarding her complaints of foot pain and fatigue?**

The credibility of witnesses is for the ALJ to determine, not for the courts. <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1219 (11th Cir. 1991). In making credibility determinations, the ALJ is entitled to consider inconsistencies between the Appellant's testimony and evidence in the medical record. 20 C.F.R. § 404. 1529(a); 416. 929(a); <u>see also</u> <u>McCray v. Massanari</u>, 175 F.Supp.2d 1329, 1337-1338 (M.D. Ala. 2001); <u>French v. Massanari</u>, 152 F.Supp.2d 1329, 1336-1337 (M.D. Fla. 2001). However, it is well-settled that the ALJ must consider an appellant's subjective testimony with respect the limitations imposed by her impairments. <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 648 (5th Cir. 1981); <u>DePaepe v. Richardson</u>, 464 F.2d 92, 99 (5th Cir. 1972).[11] "An individual's statement as to pain or other symptoms shall not alone be conclusive of disability." 42 U.S.C. § 423(d)(5). In addition to Appellant's subjective testimony regarding her limitations, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the condition; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the condition. <u>See</u> <u>Belle v. Barnhart</u>, 2005 U.S. App. LEXIS 7400, *5 (11th Cir. 2005); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ decides not to credit Appellant's

---

[11] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

testimony as to her limitations, he must articulate explicit and adequate reasons for doing so, and his credibility determination must be supported by substantial evidence. Foote v. Charter, 67 F.3d 1553, 1562 (11th Cir. 11995); Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

The Court will first address Appellant's foot problems, secondary to her plantar's wart. Appellant told the ALJ at the hearing that she has had problems with her foot over the past five or six years, stating "I don't know what this thing up on the bottom of my foot, but it hurt me when I walk. It hurt worse when I walk a long time [sic]." (T. at 387-388). Appellant also complained of her foot problems in a Daily Functioning Questionnaire, presumably for the SSA, and in a Reconsideration Disability Report to the SSA. (T. at 118, 100). In the record, there is medical evidence of her foot problem, including notations in the reports made by Dr. Koughan and caregivers in the Ryan White Program. See (T. at 252, 244, 198, 230). Also, Appellant's live-in boyfriend, Eddie, told Dr. Kent that Appellant had to scrape the bottom of her foot with a knife due to her foot condition and could not walk after she did this. (T. at 271). Thus, Appellant complained about her foot problem and there is medical evidence of this problem in the record.

Next, the Court will address Appellant's fatigue, secondary to anemia. Appellant expressly told the ALJ during the hearing that she suffered from fatigue. (T. at 393). In the record,

AO 72A
(Rev.8/82)

there is objective medical evidence of Appellant's anemia, and her complaints of fatigue, primarily in the form of lab reports and notations by examining physicians.  (T. at 228, 219, 214, 212, 209, 206, 203, 200 - lab reports showing anemia); (T. at 256 - report of "constant fatigue" to Dr. Phillipe). Thus, there is evidence of Appellant's anemic condition in the record, which supports her complaints of fatigue.

In the ALJ's decision, he acknowledged Appellant's foot complaints, noting "that she has foot pain affecting her ability to walk".  (T. at 20A). Nowhere in the ALJ's opinion, however, did he address Appellant's amenia or her complaints of fatigue. Upon consideration, the Court's review of the medical evidence in this case indicates that Appellant has a medical condition that could reasonably be expected to cause her foot pain –– a plantar's wart –– as well as a medical condition that could reasonable be expected to cause her fatigue –– anemia. Furthermore, Appellant's testimony as to her daily activities is not sufficient to support the ALJ's opinion because these activities are not directly indicative of her ability to perform light work, which requires "a good deal of walking or standing" during the work day.[12]  In fact, Appellant testified at her

---

[12] Light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, **a job is in this category when it requires a good deal of walking or standing**, or

administrative hearing that she cannot perform activities that require walking or standing for prolonged periods of time, such as vacuuming or walking down the street to the laundromat. (T. at 37). Accordingly, this case is remanded for the ALJ to consider Appellant's complaints of foot pain and fatigue, and to analyze how these complaints may relate to the objective evidence of Appellant's plantar's wart and anemia, respectively, in determining Appellant's RFC to perform her past relevant work.

**C.    Did the ALJ err in rejecting Dr. Koughan's opinion as the treating physician?**

A treating physician's testimony must be given substantial or considerable weight unless "good cause" is shown to the contrary. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "'Good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Finally, when assessing medical evidence, the ALJ must "state with particularity the weight he

---

when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b)(emphasis added).

gave the different medical opinions and the reasons therefor." <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279 (11th Cir. 1987)(citing <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986)). In the instant case, the ALJ decided not to give the opinion of Appellant's treating physician, Dr. Koughan, any weight because her opinion was (1) internally contradictory; (2) not supported by medical tests; (3) inconsistent with Appellant's daily activities; and (4) contrary to Dr. Phillipe's report.

**1. Was Dr. Koughan's opinion internally contradictory?**

First, the ALJ found that Dr. Koughan's opinion contained internal contradictions because, despite finding that Appellant had a high CD-4 count and her HIV was asymptomatic, Dr. Koughan nevertheless found that Appellant was disabled and unable to work. (T. at 19A). However, the record shows that Appellant had other medical conditions, including tendinitis, anemia and a plantar's wart, that may have formed the basis of Dr. Koughan's opinion that Appellant could not work, and the ALJ failed to discuss all of Appellant's impairments and how they may or may not have supported Dr. Koughan's opinion. Instead, the ALJ relied solely on Dr. Koughan's report of a high CD-4 count and asymptomatic HIV to discount her opinion as internally contradictory. Also, as Appellant points out, there is medical evidence that a person can have a high CD-4 count, but still suffer from fatigue due to an HIV infection. <u>See</u> (App. Br. at

13)[Doc. 9](citing S. Ferrando, et al., <u>Psychosomatic Medicine</u>, V.60, Issue 6, pp.759-764).

An ALJ commits error if he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians absent good cause. <u>Graham v. Bowen</u>, 786 F.2d 1113, 1115 (11th Cir. 1986). In this case, the ALJ did not have good cause to discount the treating physician's opinion based on perceived internal contradictions.

### 2. Does substantial evidence support the ALJ's finding that Dr. Koughan did not support her findings of disability with medical tests or documentation?

Second, the ALJ found that Dr. Koughan did not support her finding of disability with medical tests or documentation. (T. at 19A). However, at the hearing, the ALJ interrupted Appellant when she started to explain the nature and scope of Dr. Koughan's examinations:

| | |
|---|---|
| ALJ: | How many times -- well I think you told me perhaps you see this doctor [Dr. Koughan] for HIV a couple times . . . every couple months? |
| []<br>Appellant: | Yes, sir. |
| ALJ: | And when you go to see her what does she do? |
| Appellant: | She draw blood, she take x-rays and she -- they examine me for -- |
| ALJ: | Okay. Let me ask you about your daily routine. |

[Discussion of daily routine follows].

29

(T. at 394). "It is well-established that the ALJ has a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003)(citing 20 C.F.R. § 416.912(d)); see also Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997)(explaining that a hearing before an ALJ is not an adversarial proceeding). The ALJ must develop the facts fully and fairly and probe conscientiously for all the relevant information, even where a claimant is represented by counsel. Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). Here, as the transcript shows, the ALJ did not develop the record or allow Appellant to discuss fully her visits with Dr. Koughan, which could have shown that Dr. Koughan's findings of disability were supported by medical tests and/or documentation. Furthermore, the record in this case contains numerous lab tests performed through the Ryan White Program and the ALJ failed to discuss how these tests may or may not have supported Dr. Koughan's opinion. Therefore, the ALJ's finding that Dr. Koughan's conclusions were not supported by medical tests or documentation is not supported by substantial evidence.

**3. Does substantial evidence support the ALJ's finding that Dr. Koughan's opinion was contradicted by Appellant's daily activity level?**

Next, the ALJ decided not to give weight to Dr. Koughan's opinion because it was contradicted by Appellant's daily activity level. (T. at 19A). Specifically, the ALJ discounted Dr. Koughan's opinion because Appellant "cooks, washes dishes, mops,

vacuums and dust without assistance [sic]. She reads, does crossword puzzles, writes notes, watches television and listens to music. The claimant also reports that she shops and visits with her family." (T. at 19A). The ALJ concluded that "these are not the activities of an individual with a severe and disabling impairment." Id.

An ALJ need not give a treating physician's opinion considerable weight if Appellant's own testimony regarding her daily activities contradicts that opinion. Magill v. Comm'r of Soc. Sec., 2005 U.S. App. LEXIS 18934, *6 (11th Cir. 2005)(finding good cause to discount treating physician's opinion when it contradicted claimant's testimony of daily activities); Phillips, 357 F.3d at 1241 (same). Appellant testified at her May 8, 2002, hearing, however, that she cannot cook on her own, that her live-in friend, Eddie, does the cooking, and that she can only prepare "simple stuff", such as sandwiches. (T. at 395). Appellant also testified that she cannot vacuum, she cannot go to the laundromat to do the laundry on her own, that she does not go out for entertainment or to attend church, and, while she has family, "I don't go outside the home . . . I don't associate with too many people. I like to stay by myself." (T. at 396). In contrast, approximately six months prior, on November 13, 2001, Dr. Kent reported in her psychological report that Appellant "cooks without burning, turns off the faucets, and rides the bus. [] She drops things with her right wrist so

collateral bought lighter weight pots.  She washes dishes, mops, vacuums, dusts and cooks." (T. at 271).  Thus, the evidence in the record as to Appellant's daily activities is itself contradictory.

It is the duty of the ALJ to examine all the evidence and resolve the conflicts.  See 20 C.F.R. §§ 404.1527 and 416.927; see also Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996). In making disability determinations, the ALJ must consider whether the evidence is consistent and sufficient to make a determination.  Johnson v. Barnhart, 2005 U.S. App. LEXIS 13197, *11-12 (11th Cir. 2005). If it is not consistent, the ALJ weighs the evidence to reach his decision.  Id.  If, after weighing the evidence, the ALJ cannot reach a determination, then he must seek additional information or re-contact the physicians.  See 20 C.F.R. § 404.1527(c).

Foremost, the ALJ did not articulate in his opinion why he followed Dr. Kent's report as to Appellant's daily activities instead of Appellant's subsequent hearing testimony.  Indeed, while Appellant's hearing testimony as to her daily activities supports Dr. Koughan's finding that Appellant was disabled, Dr. Kent's report contradicts Dr. Koughan's opinion.  However, Dr. Kent's report is not entitled to deference because, as one-time examiner, she was not a treating physician.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987)(physicians opinions "not entitled to deference because as one-time examiners they were not

treating physicians."); see also Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986). "An ALJ does not need to give a treating physician's opinion considerable weight if the claimant's *own testimony* regarding her daily activities contradicts that opinion." Kerwick v. Comm'r of Soc. Sec., 2005 U.S. App. LEXIS 24976, *4 (11th Cir. 2005)(emphasis added)(citing Phillips, 357 F.3d at 1241. In this case, Appellant's own testimony does not contradict Dr. Koughan's opinion. Accordingly, the Court finds that the ALJ failed resolve the inconsistencies in the record regarding Appellant's daily activities and failed to articulate why he deferred to Dr. Kent's report, a one-time examining psychologist, over Appellant's *own testimony* at the administrative hearing.

### 4. Does substantial evidence support the ALJ's decision to give more weight to Dr. Phillipe's report over Dr. Koughan's opinion?

The ALJ found that Dr. Koughan's opinion was contradictory to Dr. Phillipe's report because Dr. Phillipe found that Appellant's HIV status was "improving," based on her high CD-4 count. (T. at 18A). However, as was the case with Dr. Kent, Dr. Phillipe's report is not entitled to deference because, as one-time examiner, he was not a treating physician. Gibson, 779 F.2d at 623; McSwain, 814 F.2d at 619. As noted in the previous sections, the ALJ did not discuss whether Dr. Koughan's opinion that Appellant was disabled was based on Appellant's non-HIV-related impairments, such as her tendinitis, fatigue and foot

AO 72A
(Rev.8/82)

problems. Moreover, Dr. Phillipe's report does not contradict Dr. Koughan's opinion; in fact, Dr. Phillipe found Appellant to be "positive for . . . weakness [and] numbness, stiffness, weakness, muscle pain in extremities". (T. at 257). Dr. Phillipe also performed a blood test on Appellant and found her red blood cell count to be low. (T. at 258). Thus, the ALJ's finding that Dr. Phillipe's opinion contradicted Dr. Koughan's was not supported by substantial evidence.

In sum, the ALJ's decision not to accord Dr. Koughan's opinion any weight was not supported by substantial evidence. This case is therefore remanded in order for the ALJ to either accord the proper deference to the treating physician's opinion, or to articulate legally sufficient reasons for discounting Dr. Koughan's opinion.

**D. Did the ALJ properly evaluate Appellant's IQ and mental capacity in accordance with Listing 12.05C?**

With respect to her IQ and mental retardation, Appellant first argues that the ALJ erred in not finding that Appellant's mental impairments met Listing 12.05C. (App. Br. at 20-21)[Doc. 9]. In response, the Commissioner contends that Appellant did not meet Listing 12.05C because there was no evidence that she had significantly sub-average intellectual functioning, as required by the regulation. (Def. Br. at 12-19)[Doc. 10].

Listing 12.05C states as follows:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially

34

> manifested during the developmental period (before age 22). The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 **and** a physical or other mental impairment imposing additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, 12.05C (emphasis added). In other words, "a claimant meets the mental retardation listing, 12.05C, when the following are shown: (1) a valid IQ score of 60 to 70 inclusive; and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); see also Popp v. Heckler, 779 F.2d 1497, 1499-1450 (11th Cir. 1986). Therefore, the fact that the numerical score is under 70 does not end the inquiry. "When considering whether the plaintiff has a physical or mental impairment imposing significant work-related limitation of function in addition to a low verbal scale IQ, the Commissioner must consider the plaintiff's impairments in combination." Cobb v. Barnhart, 296 F. Supp. 2d 1295, 1296-1297 (N.D. Ala 2003). Finally, there is a presumption that mental retardation is a lifelong impairment that manifests itself prior to age 22 absent evidence of sudden trauma capable of causing mental retardation. Hodges v. Barnhart, 276 F.3d 1265, 1268-1269 (11th Cir. 2001).

35

In the instant case, Appellant's IQ met the threshold requirements of Listing 12.05C.[13]  However, the ALJ failed to analyze Appellant's IQ scores under the first prong of Listing 12.05C.  Also, the ALJ also failed to determine whether Appellant met the second prong of the analysis required by Listing 12.05C -- whether her impairment imposes additional and significant work-related limitation of function.  <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1220 (11th Cir. 1997)(12.05C met "when the claimant presents a valid IQ score of 60 through 70 inclusive, and when the claimant presents evidence of an additional mental or physical impairment significantly affecting claimant's ability to work.").  Accordingly, this case is remanded for the ALJ to address Appellant's IQ and determine if she meets the standards for mental impairment set forth in the two-prong analysis set forth in Listing 12.05C.

**E.    Application of <u>Moore v. Barnhart</u>, 405 F.3d 1208 (11th Cir. 2005)**

Finally, at the April 26, 2005, hearing before this Court, the parties raised the issue of whether the ALJ's decision meets

---

[13] An examining psychologist found that Appellant had a verbal IQ of 71, a performance IQ of 68, and a full scale IQ of 67.  (T. at 270-273).  Where more than one IQ is derived from the test administered, the lowest score is used in conjunction with listing 12.05.  20 C.F.R. pt. 404, subpt. P, app. 1, 12.00D; <u>Ambers v. Heckler</u>, 736 F.2d 1467, 1470 (11th Cir. 1984).  Accordingly, Appellant's relevant IQ score is 67.  This score meets the requirements of 12.05C. <u>Cf.</u> <u>Anderson v. Sullivan</u>, 925 F.2d 220, 222 (7th Cir. 1991)(concluding claimant's score of 71 did not meet 12.05C); <u>Cockerham v. Sullivan</u>, 895 F.2d 492, 496 (8th Cir. 1990)(same).

the requirements set forth in the Eleventh Circuit's April 12, 2005, decision in <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1214 (11th Cir. 2005).  In <u>Moore</u>, the Eleventh Circuit held that "where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF [Psychiatric Review Technique Form], append it to the decision, **_or_** incorporate its mode of analysis into his findings and conclusions.  Failure to do so requires remand."  <u>Id.</u> at 1214 (emphasis added).  In the instant case, the Court finds that Plaintiff presented a colorable claim of mental impairment because she meets the threshold requirement of Listing 12.05C. However, the ALJ failed to complete a PRTF or otherwise incorporate its mode of analysis in his decision.  Accordingly, upon remand, the ALJ should either complete and attach the PRTF or incorporate its mode of analysis into his opinion.

## VIII.
## Conclusion

In accordance with the above discussion, the Commissioner's decision is **REMANDED** for rehearing pursuant to 42 U.S.C. § 405(g) for further proceedings.  Melkonyan v. Sullivan, 501 U.S. 89 (1991).  Specifically, the ALJ should: (1) Consider Appellant's anemia, fatigue, plantar's wart and associated foot problems at all applicable steps throughout the sequential evaluation process -- particularly during steps two and five -- in accordance with 20 C.F.R. § 416.923; (2) Consider Appellant's complaints of foot pain and fatigue, and analyze how these

37

complaints relate to the objective evidence in the record of Appellant's plantar's wart and anemia, respectively, in determining Appellant's RFC to perform her past relevant work; (3) Either accord deference to the opinion of Dr. Koughan, the treating physician, or articulate legally sufficient reasons for discounting her opinion; (4) Address Appellant's IQ and determine if she meets the two-prong test set forth in Listing 12.05C; and (5) Complete a PRTF form or incorporate its mode of analysis in his decision.

**SO ORDERED** this 23rd day of March, 2006.

S/ *E. Clayton Scofield III*
E. Clayton Scofield III
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)